# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| H&L Contracting LLC | ) ASBCA No. 63695 |
| | ) |
| Under Contract No. W912WJ-22-C-0012 | ) |

APPEARANCES FOR THE APPELLANT:    Michael H. Payne, Esq.
   Cohen Seglias Pallas Greenhall
    & Furman PC
   Philadelphia, PA

   Matthew C. Long, Esq.
   Cohen Seglias Pallas Greenhall
    & Furman PC
   Washington, DC

APPEARANCES FOR THE GOVERNMENT:    Michael P. Goodman, Esq.
   Engineer Chief Trial Attorney
   Theresa A. Negron, Esq.
   Sheena M. Wandera, Esq.
   Engineer Trial Attorneys
   U.S. Army Engineer District, New England

## OPINION BY ADMINISTRATIVE JUDGE MCLISH
## ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

Appellant H&L Contracting LLC (H&L) appeals from a final decision of a contracting officer for the United States Army Corps of Engineers (USACE or respondent) denying H&L's claims arising from a contract to dredge two channels in Newburyport Harbor in Newburyport, Massachusetts. The government moves for summary judgment in its favor, and H&L moves for summary judgment on the issue of entitlement. For the reasons stated below, the motions are denied.

STATEMENT OF FACTS FOR PURPOSES OF THE MOTIONS[1]

USACE awarded H&L a contract to dredge shoaled sediments from the 9-foot and 15-foot navigation channels in Newburyport Harbor, Newburyport, MA.[2] The solicitation for the contract said this about the sea conditions in the channels in Section 1.4.1 of Specification 01 11 00:

> Data and information furnished or referred to below is for the Contractor's information. The Government shall not be responsible for any interpretation of or conclusion drawn from the data or information by the Contractor.
>
> a. Site Conditions: The indications of physical conditions on the drawings and in the specifications are the result of site investigations and surveys. The conditions represented prevailed at the time the investigations and surveys were made. A pre-dredge survey may be performed by the Government prior to the start of Contractor dredging operations at the site. Before commencing work at the site, the Contractor shall verify the existing conditions indicated on the drawings and in the specifications. *See* CONTRACT CLAUSE entitled "SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK".
>
> b. Weather Conditions: The monthly normal mean temperature and the monthly normal mean precipitation for the site may be obtained by the Contractor from the nearest U.S. National Weather Service Office.

---

[1] In contravention of Board Rule 7, USACE's opposition to H&L's Motion for Summary Judgment did not include a Statement of Genuine Issues of Material Fact responding to H&L's Statement of Undisputed Material Facts. USACE belatedly submitted a "Reply to H&L Statement of Undisputed Material Facts" that, in conclusory fashion, purports to deny certain of H&L's statements of fact. Although Rule 7(c)(2) allows us to consider each of H&L's statements of fact to be undisputed in these circumstances, here we opt to treat as disputed those for which USACE makes properly-supported assertions in its Statement of Undisputed Material Facts.

[2] Appellant's Statement of Undisputed Material Facts (ASUMF) ¶¶ 1, 89; Respondent's Statement of Undisputed Material Facts (RSUMF) ¶ 1; Appellant's Statement of Genuine Issues of Material Facts (ASGIMF) ¶ 1; R4, tab 4 at 125-26.

c. Conditions of 9 Foot Channel: Under most weather conditions, the 9 Foot Channel has swells up to 1 foot. The 9 Foot Channel was last dredged in 2011 and has experienced considerable shoaling since that time.

d. Conditions at 15 Foot Entrance Channel: The tidal currents at the entrance to the harbor can be substantial, creating potentially dangerous conditions. Under good weather conditions, the sea swell is typically 1-2 feet in a northerly direction. In normal weather conditions, the sea swell can range from 2 to 4 feet or more.[3]

In preparing its bid for the contract, H&L relied on the information provided in the solicitation, as well as its extensive dredging experience.[4] Although H&L did not attend a site visit hosted by USACE, its managing member had twice visited and observed the Newburyport channels.[5] H&L did not consult publicly available websites containing weather data for the Newburyport area or make inquiries with the Newburyport Harbormaster or U.S. Coast Guard.[6] What such inquiries would have revealed regarding the sea conditions in the 15-foot channel is not evident from the record.

H&L compared the specifications for the Newburyport project to those used for a similar dredging project H&L had performed for USACE a few years earlier at Hampton Harbor, located at Hampton and Seabrook, New Hampshire.[7] Hampton Harbor is about five miles from Newburyport harbor and the physical orientation of its channel is similar to that of Newburyport channels.[8] USACE's solicitation for the Hampton Harbor project described the ocean conditions there using language very similar to the language it used to describe the 15-foot channel in Newburyport Harbor.[9] H&L successfully completed dredging of the Hampton Harbor entrance channel using a 16-foot' cutterhead dredge in November and December 2019.[10] Because of the similarities in solicitation language and channel orientation, H&L

---

[3] ASUMF ¶ 66; RSUMF ¶¶ 5, 6, 12, 13; ASGIMF ¶¶ 5, 6, 12, 13; R4, tab 6 at 182.

[4] ASUMF ¶ 17, 81.

[5] ASUMF ¶ 82; RSUMF ¶ 16; ASGIMF ¶ 16.

[6] Gov't opp'n at ex. 6, Haney depo tr. at 32:4-15, 49:6-14.

[7] ASUMF ¶ 81.

[8] *Id.* ¶¶ 18, 81.

[9] *Id.* ¶ 21; app. supp. R4, tab 3 at 0402.

[10] ASUMF ¶¶ 22, 23.

expected that the 15-foot entrance channel conditions at Newburyport Harbor would be similar to those it had experienced at Hampton Harbor.[11]

Based on the information it reviewed, H&L concluded that normal conditions in the 15-foot channel during the permitted dredging season would consist of swells between two and four feet, with swells occasionally exceeding four feet. H&L also concluded that the 15-foot channel would experience some days of good weather, where swells would be between one and two feet. [12]

H&L selected two dredges to perform the Project – the 16-inch Finn for work in the 9-foot channel and the 20-inch Oyster Bay for work in the 15-foot channel. Both dredges are hydraulic cutterhead dredges.[13] Cutterhead pipeline dredges are less suitable for rough seas than hopper dredges.[14] USACE was aware that H&L was proposing to use a cutterhead pipeline dredge.[15]

The Oyster Bay can comfortably dredge in swells up to three feet. It must cease dredging when swells are more than three feet, but the dredge can stay moored at its location. Where swells reach or exceed five feet, however, the Oyster Bay must return to shore. This results in downtime of approximately 48 hours.[16]

H&L successfully completed dredging of the nine-foot channel in November 2022.[17] For the 15-foot channel, H&L mobilized the Oyster Bay to Newburyport Harbor in December 2022 and anticipated a dredging duration of 47 days.[18] Prior to and after mobilization of the Oyster Bay, USACE inspected the vessel four times and on each occasion found deficiencies that required correction.[19]

H&L began its efforts to dredge the 15-foot channel using the Oyster Bay in December 2022, but the Oyster Bay was unable to complete any dredging.[20] On February 3, 2023, H&L submitted a request for an extension of time that contended that, throughout December and January, H&L encountered sea swells in the 15-foot entrance channel that were significantly larger than expected.[21] USACE approved this

---

[11] *Id.* ¶ 81.
[12] *Id.* ¶ 83.
[13] *Id.* ¶ 84.
[14] *Id.* ¶¶ 13, 15.
[15] *Id.* ¶¶ 87, 90.
[16] *Id.* ¶ 85.
[17] *Id.* ¶ 92.
[18] *Id.* ¶ 94.
[19] RSUMF ¶¶ 27, 29, 31, 35; ASGIMF ¶¶ 27, 29, 31, 35.
[20] ASUMF ¶¶ 94, 95, 104; RSUMF ¶ 30; ASGIMF ¶ 30.
[21] ASUMF ¶¶ 96-98; app. supp. R4, tab 25.

extension and obtained state regulatory approval to continue entrance channel dredging through April 30, 2023.[22] H&L contends that it continued to encounter swells in excess of four feet in the entrance channel, including numerous days where swells were six to eight feet or more.[23]

Ultimately, H&L arranged for a subcontractor to provide an ocean-going dredge to complete the dredging of the 15-foot channel. The subcontractor mobilized to Newburyport Harbor in March 2023 and completed dredging the 15-foot entrance channel in April 2023.[24]

After receiving information about USACE's prior representations regarding dredging work in Newburyport Harbor in response to a Freedom of Information Act request, H&L submitted a Request for Modification to USACE asserting that USACE possessed and failed to disclose superior knowledge concerning the entrance channel conditions and the need for an ocean-going dredge in order to successfully dredge the 15-foot channel.[25]

H&L learned that, when the 15-foot channel at Newburyport had last been dredged in 2010, USACE's solicitation for that contract portrayed the ocean swell at the 15-foot channel differently than did the 2022 solicitation. The 2010 solicitation stated that, during the dredging window of September-March, seas in the river mouth could be more than eight feet about six days per month.[26] The specifications for the 2010 contract also emphasized the need for dredging equipment that could handle rough sea conditions, while the 2022 specifications did not.[27] It noted that:

> [d]ue to the hazardous nature of the area of dredging, the vessels will need a certification, provided by an accredited marine surveyor, that certifies that the dredge/vessel can operate for its intended purpose in the sea state, current and surf conditions that exist in and around the opening of the Merrimack River and Atlantic Ocean, and insurance coverage for the classification 'oceans' route.[28]

At a pre-bid conference for the 2010 solicitation, USACE made a presentation (later added to the solicitation) that informed bidders that the 15-foot entrance channel

---

[22] ASUMF ¶ 99; app. supp. R4, tab 28 at 1891, tab 31 at 1898-1901.
[23] ASUMF ¶ 100.
[24] ASUMF ¶¶ 103, 107.
[25] *Id.* ¶¶ 108-110; R4, tab 24 at 270-79.
[26] ASUMF ¶ 3; app. supp. R4, tab 1 at 178.
[27] ASUMF ¶¶ 2-10.
[28] ASUMF ¶ 10; app. supp. R4, tab 2 at 375 (track changes omitted).

could be "very rough," bidders may want to contact the Coast Guard Station for more information, and dredging equipment needed to be qualified to work in the expected conditions.[29] H&L eventually learned that all prior dredging of the 15-foot channel had been performed by hopper dredges or ocean-certified cutterhead dredges.[30]

In addition, H&L learned that, since the 2010 dredging, USACE had conducted a study relating to the Newburyport Harbor entrance channel. The study resulted in a report, the "Section 204 Report," which stated, among other things, that the shoaling in the entrance presented a navigation hazard and under certain conditions the seas can become "violent," subjecting vessels to "unsafe conditions which may result in hazardous situations and damages."[31]

The USACE team that prepared the 2022 solicitation included individuals who had been involved in the preparation of the 2010 solicitation, the Hampton Harbor solicitation and the Section 204 Report.[32]

H&L further learned that, prior to issuing the 2022 solicitation, USACE had prepared a document recording the assumptions and conditions forming the basis of the solicitation, referred to as the Basis of Design. Among other things, the Basis of Design included an analysis that determined that "[t]he long-term average northeastern significant wave height at the harbor entrance was computed to be 3.8 feet."[33]

H&L contends that, from the prior solicitations for Newburyport and Hampton Harbors, the Section 204 Report, and the Basis of Design, USACE was aware, but did not disclose in the 2022 solicitation, that:

  a. The conditions at the Newburyport Harbor 15-foot entrance channel were a "rougher situation" than those at the Hampton Harbor entrance channel.

  b. Swells in the entrance channel can be in excess of eight feet six days per month;

  c. Sea conditions in the entrance channel can be "violent" and "very rough";

[29] ASUMF ¶¶ 4, 5, 6, 8.
[30] *Id.* ¶ 38.
[31] *Id.* ¶¶ 24-32; app. supp. R4, tab 4 at 716.
[32] ASUMF ¶¶ 7, 20, 25, 34-37.
[33] *Id.* ¶¶ 55-57; app. supp. R4, tab 14 at 1110.

d. The long-term average swell height at the harbor entrance was 3.8 feet; and

e. All prior dredging of the 15-foot channel had been performed by either hopper dredges or a cutter head dredge certified for use in ocean conditions.

f. Considerable shoaling had occurred in the 15-foot channel since it was last dredged.[34]

There is no evidence that the 2010 Newburyport solicitation or the Basis of Design for the 2022 Newburyport solicitation were publicly available. There is evidence that the Section 204 report was circulated for public review and posted publicly in February 2021, before H&L submitted its bid for this project.[35]

H&L contends that USACE was aware that an ocean-certified dredge would be necessary and had required the use of an ocean-certified dredge in the solicitation for the 2010 dredging contract.[36] H&L also claims that USACE was aware that all prior dredging of the 15-foot channel had been performed using hopper dredges, which are more suitable for rough seas than cutterhead pipeline dredges, or ocean-certified cutterhead dredges, and it knew from H&L's bid that the cutterhead dredging equipment H&L intended to use was not ocean-certified and could not operate in swells greater than three feet.[37]

H&L further contends that it would not have bid on the Solicitation or would have planned to use a different dredge in the 15-foot entrance channel had USACE included language in the 2022 Solicitation similar to that in the 2010 Solicitation warning of very rough sea conditions and requiring an ocean-going dredge. Similarly, H&L either would not have submitted a bid or would have planned on the use of a different dredge in the entrance channel had USACE informed bidders that the sea conditions at the Newburyport Harbor entrance channel were more severe than those at Hampton Harbor.[38]

---

[34] ASUMF ¶¶ 29-32, 41, 58, 68, 72; app. mot. at 39.
[35] Gov't opp'n at ex. 2 (Decl. of C. Hatfield) at ¶ 8; and ex. 3.
[36] ASUMF ¶ 10.
[37] *Id.* ¶¶ 38, 90.
[38] *Id.* ¶ 91; H&L also learned that USACE had prepared an Independent Government Estimate (IGE) based on the 2022 solicitation. The IGE was prepared by USACE engineering personnel that were not part of the project team and was intended to be representative of a reasonable bid in response to the 2022 Solicitation. H&L contends that the IGE demonstrates that the conclusions H&L drew from the solicitation regarding conditions at the entrance channel

On March 10, 2023, H&L submitted a Request for Modification to USACE asserting that USACE possessed superior knowledge concerning the sea conditions at the 15-foot entrance channel and the need for an ocean-going dredge.[39] USACE denied the request on April 6, 2023, asserting in part that:

> It is common knowledge within the dredging industry that the most favorable sea conditions for dredging occur in late summer/early fall and then again in the period from spring through the end of the dredging season. Typically, sea conditions are least favorable for marine and dredging operations during the late fall through winter timeframe. It is not unusual to incur a significant amount of lost dredging days due to severe weather when working during the winter months in New England.

USACE also stated that:

> USACE has the expectation that our contractors are knowledgeable of local harbor, weather, and marine conditions and will plan accordingly when bidding work. The actual conditions encountered during execution of the specified contract work are consistent with what a reasonable contractor engaged in this line of work should have reasonably expected to occur.[40]

USACE also asserted that Specification 01 11 00, Section 1.9.6, provides Points of Contact for the Newburyport Harbormaster and Coast Guard, and that "[a]dditional information on the local seasonal conditions at the mouth of the Merrimack River could have been obtained by contacting either of those specified points of contact during the bidding period."[41]

H&L submitted a certified claim again alleging that USACE improperly withheld superior knowledge regarding the entrance channel conditions and the need for an ocean-going dredge. H&L also asserted that Specification 01 11 00, Section 1.4.1(d), constituted a defective specification and, alternatively, that the parties had made a mutual mistake of fact. The claim argued that USACE had effectively misled H&L into believing that its proposed dredging equipment was suitable for

---

and the appropriate dredging equipment were reasonable based on the information available to the bidders. (*Id.* ¶¶ 73-79; app. supp. R4, tab 20)

[39] ASUMF ¶ 110; R4, tab 24.

[40] ASUMF ¶ 111; R4, tab 26 at 282, 284.

[41] ASUMF ¶ 112; R4, tab 26 at 283.

working in the sea conditions it reasonably expected, even though USACE knew that the equipment was not suitable for the sea conditions that actually existed. H&L claimed the right to recover $5,477,410.44, in additional costs.[42]

USACE's contracting officer denied H&L's claim. The contracting officer asserted that the exculpatory language at the beginning of Section 1.4.1 of Specification 01 11 00 relieved USACE of liability and that Solicitation language "puts the onus on the Contractor to verify the existing conditions…." The contracting officer also stated that "[t]he marine conditions during the winter months at an entrance channel in the Northeast are not unknown conditions because H&L could have reasonably anticipated these conditions from the contract documents, site inspection and its general experience." The contracting officer further determined that "H&L could have availed itself of various public information sources to determine relevant conditions through the contractual period of performance, to include, but not limited to, information about the Newburyport Harbor from NOAA, the Newburyport Harbormaster, and the U.S. Coast Guard." Finally, the decision asserted that H&L's dredging of the 15-foot channel "was possible earlier in the period of performance."[43]

H&L timely appealed to the Board. Its complaint set out three theories of entitlement: defective specifications, superior knowledge, and mutual mistake.[44]

DECISION

## I.      Summary Judgment Standard

We look to Rule 56 of the Federal Rules of Civil Procedure for guidance in deciding summary judgment motions. Board Rule 7(c)(2); *Fluor Intercontinental, Inc.*, ASBCA Nos. 62550, 62672, 22-1 BCA ¶ 38,105 at 185,099. "Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law." *Crown Operations Int'l, Ltd. v. Solutia, Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002). The applicable substantive law identifies which facts are material and might affect the outcome of the appeal. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its initial burden, the opposing party "'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.*. at 248 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288

---

[42] ASUMF ¶ 113; R4, tab 3.
[43] ASUMF ¶ 114-16; R4, tab 2 at 19, 20, 21.
[44] Compl. at 7, 8, 10.

(1968)).   Our task at this stage is not "to weigh the evidence and determine the truth of the matter, but rather to ascertain whether material facts are disputed and whether there exists any genuine issue for trial."   *Holmes & Narver Constructors, Inc.*, ASBCA Nos. 52429, 52551, 02-1 BCA ¶ 31,849 at 157,393 (internal quotations omitted) (quoting *Liberty Lobby*, 477 U.S. at 249).   A dispute is genuine only if, on the entirety of the record, a reasonable factfinder could resolve a factual matter in favor of the nonmovant.   *Liberty Lobby*, 477 U.S. at 248.   The evidence must be viewed in the light most favorable to the party opposing the motion.   *Crown Operations,* 289 F.3d at 1375.

We are not required to rule for one side or the other merely because both parties have moved for summary judgment, each asserting that there are no material issues of fact.   *Northrop Grumman Corporation,* ASBCA No. 62165, 23-1 BCA ¶ 38,394 at 186,557.   Rather, "[e]ach cross-motion is evaluated separately on its merits, and all reasonable inferences are drawn in favor of the defending party; the Board is not bound to 'grant judgment as a matter of law for one side or the other.'"   *Osborne Constr. Co.,* ASBCA No. 55030, 09-1 BCA ¶ 34,083 at 168,513 (quoting *Mingus Constructors*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

## II.     Issues of Fact Preclude Summary Judgment on H&L's Superior Knowledge Claim

To prevail on its superior knowledge theory, H&L must establish the following four elements:  (1) it "undertook to perform without vital knowledge of a fact that affects performance costs or duration;" (2) "the government was aware [plaintiff] had no knowledge of and had no reason to obtain such information;" (3) "any contract specification supplied misled [plaintiff] or did not put it on notice to inquire;" and (4) "the government failed to provide the relevant information."   *Giesler v. United States*, 232 F.3d 864, 876 (Fed. Cir. 2000) (citing *Hercules Inc. v. United States*, 24 F.3d 188, 196 (Fed. Cir. 1994)).

Summary judgment for H&L on this claim is appropriate only if demonstrates that all four elements are established by undisputed facts.  Summary judgment for the government is appropriate if undisputed facts show that at least one of the four elements is not present here.  Because there are disputes of fact as to each element, neither party is entitled to summary judgment on this claim.

As to the first element, the parties' factual disputes include whether the information about sea conditions at the entrance channel H&L claims should have been disclosed was vital to its performance or, instead, was not materially different than what had been disclosed in the solicitation.  Also disputed is whether the lack of disclosure affected H&L's performance or, instead, had no significant effect because the actual conditions H&L experienced were not substantially different than the

10

conditions described in the solicitation. *Cf., Shoreline Foundation, Inc.,* ASBCA No. 62876, 24-1 BCA ¶ 38,607 at 187,678 (denying summary judgment where unclear whether undisclosed information would have changed contractor's bidding strategy). This dispute turns in part on the parties' differing interpretations of the words "or more" in the specification phrase "the sea swell can range from 2 to 4 feet or more" (R4, tab 6 at 182). Resolution of this interpretation issue may require a determination of how a knowledgeable contractor would have understood that phrase and whether a reasonable contractor would have inquired further. *See Marine Indus. Constr., LLC v. United States,* 158 Fed. Cl. 158, 193-94 (2022) (denying cross-motions for summary judgment where unclear how reasonable and prudent contractor would interpret government representation in solicitation); *R.L. Persons Constr., Inc.*, ASBCA No. 60121, 18-1 BCA ¶ 37,007 at 180,237 ("the determination of the reasonableness of each party's interpretation of the [contract] language may raise a question of fact precluding summary judgment.").

Also in dispute is whether the Oyster Bay was unsuitable for dredging the 15-foot channel even under the conditions as described in the specification; if so, the allegedly vital undisclosed information may not have saved H&L from the difficulties and increased costs it blames on the nondisclosure. Because of these disputes and others, we cannot resolve on summary judgment whether or not H&L undertook to perform without vital knowledge of a fact that affects performance costs or duration.

Factual disputes also exist regarding the second element, which prevent us from resolving at this stage whether the government was aware H&L had no knowledge of and had no reason to obtain the information that it contends should have been disclosed. Among the factual disputes are whether H&L's pre-bid investigation of the relevant sea conditions was reasonable; whether the allegedly vital undisclosed information regarding the specific sea conditions at the 15-foot channel was publicly available; whether USACE believed it to be publicly available; and whether H&L could have and should have obtained the information through a more thorough pre-bid investigation, including by attending the site visit, consulting government weather sources and searching specifically for the Section 204 Report. *Cf., Shoreline Foundation,* 24-1 BCA at 187,678 (denying summary judgment where unclear if contractor could have obtained site-specific information from other sources, including those listed in the contract).

USACE contends that the allegedly vital undisclosed information was publicly available and could have been obtained by H&L before it submitted its bid (e.g., gov't opp'n at 7 ("A simple search of the NOAA website would have provided H&L with all the information that H&L could possibly need regarding the weather and sea conditions at the 15-ft. channel.")). It relies primarily on declarations by individuals describing in general terms the types of information available (gov't reply at ex. 5 (Decl. of Ms. Melinda Bailey), ex. 6 (Decl. of Mr. Timothy Chase), ex. 7 (Decl. of

Mr. Paul Hogg)). However, the declarations do not demonstrate what specific information regarding the 15-foot channel at Newburyport could have been discovered, much less that it was the same as the information H&L claims should have been disclosed.[45]

As to the third element, factual disputes exist as to, among other things, whether the specification describing the channel conditions was misleading under the circumstances. Also in dispute is whether the conclusions H&L drew from the allegedly misleading specification language (as well as the Hampton Harbor specification) were reasonable. The parties also dispute whether the solicitation put H&L on notice to inquire about the sea swell conditions in the 15-foot channel, which is debatable from the language and may require witness testimony to resolve. These, as well as the factual disputes addressed above regarding the first element, preclude us from determining at this stage whether the third element is met here.

The fourth element is also the subject of factual disputes. Whether that element is present here requires resolution of disputes such as the extent to which the solicitation effectively conveyed the substance of the allegedly vital undisclosed information and whether the conditions H&L encountered during performance were significantly different than described in the specification.

Accordingly, neither party is entitled to summary judgment on the superior knowledge claim.

## III. Issues of Fact Preclude Summary Judgment on the Defective Specifications Claim

Both parties have also failed to demonstrate an absence of material factual disputes as to H&L's defective specifications clam. The Federal Circuit has summarized the relevant legal principles governing a defective specification claim of this type as follows:

> Whenever the government uses specifications in a contract, there is an accompanying implied warranty that these specifications are free from errors. . . . In order to recover an equitable adjustment based upon an erroneous specification, a contractor must show that it was misled by the error in the specification. . . . Thus, a claimant is not

---

[45] H&L contends USACE's declarations are defective in various respects. Because we deny the motions for summary judgment, we need not and do not resolve those issues here.

12

> entitled to recover when it was aware of a defect in the specification at the time of entering into a contract. . . . In addition, a claimant is eligible for an equitable adjustment only if it can show that its conduct in preparing its bid was reasonable. . . . As such, when a contractor is faced with an obvious omission, inconsistency or discrepancy of significance, he is obligated to bring the situation to the government's attention if he intends subsequently to resolve the issue in his own favor.

*E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1338–39 (Fed. Cir. 2004) (citations omitted). *See also R.L. Persons*, 18-1 BCA at 180,237 ("[g]overnmental disclaimers of responsibility for the accuracy of specifications which it authors are viewed with disdain by the courts.") (*quoting Edsall Constr. Co.,* ASBCA No. 51787, 01-2 BCA ¶ 31,425 at 155,181).

Here, the factual disputes relevant to the defective specifications claim include whether the specification at issue was materially inaccurate, whether H&L was misled by the alleged inaccuracies, and whether H&L conducted a reasonable pre-bid investigation. These open factual questions preclude us from determining at the summary judgment stage whether H&L will be able to prove its defective specifications claim.

## IV.    **Issues of Fact Preclude Summary Judgment on the Mutual Mistake of Fact Claim**

To recover under a theory of mutual mistake of fact, a party must demonstrate four elements:

1) the parties to the contract were mistaken in their belief regarding a fact;

2) that mistaken belief constituted a basic assumption underlying the contract;

3) the mistake had a material effect on the bargain; and

4) the contract did not put the risk of the mistake on the party seeking reformation.

*Nat'l Australia Bank v. United States*, 452 F.3d 1321, 1329 (Fed. Cir. 2006) (citing *Atlas Corp. v. United States*, 895 F.2d 745, 750 (Fed. Cir. 1990)).

13

Again, neither party has demonstrated that H&L's entitlement to recovery under this theory can be resolved based on undisputed facts. To decide the mutual mistake claim, factual determinations must first be made as to whether both parties were mistaken about one or more facts relating to the sea conditions at the 15-foot channel and the type of equipment needed, and if so, which specific facts were mistaken. The answers to those questions are not evident from the undisputed facts. These initial determinations are necessary in order to then address whether any mutual mistakes were a basic assumption of the contract and had a material effect on the parties' bargain, and whether the contract put the risk of those particular mistakes on H&L.

CONCLUSION

Respondent's Motion for Summary Judgment and Appellant's Motion for Summary Judgment on the Issue of Entitlement are denied.

Dated: November 21, 2024

THOMAS P. MCLISH
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

14

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63695, Appeal of H&L Contracting LLC, rendered in conformance with the Board's Charter.

Dated:  November 21, 2024

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals